UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
ROYCE MATHEW,

                    Plaintiff,                            Case No: _____

        -against-                           Filing Date: June 10, 2013

THE WALT DISNEY COMPANY; TED ELLIOTT;
TERRY ROSSIO; JASON SURRELL; MARTIN A.
SKLAR; DISNEY ENTERPRISES, INC.; WALT DISNEY
PICTURES (d/b/a BUENA VISTA MOTION PICTURES
GROUP and THE WALT DISNEY STUDIOS, and f/k/a
WALT DISNEY PICTURES AND TELEVISION);
BUENA VISTA HOME ENTERTAINMENT, INC.;
BUENA VISTA PICTURES DISTRIBUTION, INC.;
BUENA VISTA TELEVISION, LLC (f/k/a BUENA
VISTA TELEVISION); BUENA VISTA GAMES, INC.;
FIRST MATE PRODUCTIONS, INC.; ABC, INC.;
ABC ENTERPRISES, INC.; JERRY BRUCKHEIMER;
JERRY BRUCKHEIMER, INC.; JERRY BRUCKHEIMER
FILMS; and "JOHN DOES 1-50," WHOSE IDENTITY
WILL BE ASCERTAINED DURING DISCOVERY TO
INCLUDE ADDITIONAL PERSONS AND ENTITIES
RESPONSIBLE FOR THE ALLEGED MISCONDUCT,

                    Defendants.
------------------------------------------------------------------------x

## COMPLAINT FOR COPYRIGHT INFRINGEMENT AND OTHER RELIEF AND DEMAND FOR JURY TRIAL

### Introduction

1.      Since 2003, the Pirates of the Caribbean motion picture franchise (the "POC Movie Franchise") has generated billions of dollars in revenue, including but not limited to box office receipts, merchandising receipts and licensing receipts.  In fact, during the three year period preceding the commencement of this action, the POC Movie Franchise has generated more than $1 billion in box office receipts, merchandising receipts and licensing receipts.

1

2.     The multi-billion value of the POC Movie Franchise is based upon the Defendants' unauthorized use and unauthorized exploitation of fictional characters, supernatural elements, storylines, plots, themes, sequence structures, screenplay elements and other original works that were authored and created by the Plaintiff (the "POC Works").

3.     Defendant The Walt Disney Company has represented to the public that Disney owns the copyright to the POC Works.  Those representations made to the public by The Walt Disney Company are false.  The true facts are that Royce Mathew owns the copyrights to the POC Works upon which the multi-billion value of the POC Movie Franchise is based.  Accordingly, Royce Mathew is entitled to the billions of dollars in profits that have been kept by Disney.

## The Parties

4.     Royce Mathew ("Royce") is an individual domiciled in the State of Florida.

5.     The Walt Disney Company ("TWDC") is a Delaware corporation that is authorized to do business in the State of New York and who is, and has been, improperly using and exploiting Royce's POC Works, in the State of New York and elsewhere, in connection with the POC Movie Franchise and otherwise.

6.     Upon information and belief, Ted Elliott ("Elliott") is an individual domiciled in the State of California and who is, and has been, improperly using and exploiting Royce's POC Works, in the State of New York and elsewhere, in connection with the POC Movie Franchise and otherwise.

7.     Upon information and belief, Terry Rossio ("Rossio") is an individual domiciled in the State of California and who is, and has been, improperly using and exploiting

Royce's POC Works, in the State of New York and elsewhere, in connection with the POC Movie Franchise and otherwise.

8.      Upon information and belief, Jason Surrell ("Surrell") is an individual domiciled in the State of Florida and who is, and has been, improperly using and exploiting Royce's POC Works, in the State of New York and elsewhere, in connection with the POC Movie Franchise and otherwise.

9.      Upon information and belief, Martin A. Sklar ("Sklar") is an individual domiciled in the State of California and who is, and has been, improperly using and exploiting Royce's POC Works, in the State of New York and elsewhere, in connection with the POC Movie Franchise and otherwise.

10.      Disney Enterprises, Inc. ("DEI") is a Delaware corporation that is authorized to do business in the State of New York and who is, and has been, improperly using and exploiting Royce's POC Works, in the State of New York and elsewhere, in connection with the POC Movie Franchise and otherwise.

11.      Walt Disney Pictures ("WDP") is a California corporation that is authorized to do business in the State of New York and who is, and has been, improperly using and exploiting Royce's POC Works, in the State of New York and elsewhere, in connection with the POC Movie Franchise and otherwise.  Upon information and belief, WDP does business under various trade names and/or WDP has divisions operating under various trade names, and such trade names include Buena Vista Motion Pictures Group and The Walt Disney Studios (f/k/a Walt Disney Pictures and Television), and such divisions and/or trade names are, and have been, improperly using and exploiting Royce's POC

Works, in the State of New York and elsewhere, in connection with the POC Movie Franchise and otherwise.

12.     Buena Vista Home Entertainment, Inc. ("BVHEI") is a California corporation that is authorized to do business in the State of New York and who is, and has been, improperly using and exploiting Royce's POC Works, in the State of New York and elsewhere, in connection with the POC Movie Franchise and otherwise.

13.     Upon information and belief, Buena Vista Pictures Distribution, Inc. ("BVPDI") is a California corporation that conducts business in the State of New York and who is, and has been, improperly using and exploiting Royce's POC Works, in the State of New York and elsewhere, in connection with the POC Movie Franchise and otherwise.

14.      Buena Vista Television, LLC (f/k/a Buena Vista Television) is a California limited liability company that is authorized to do business in New York and who is, and has been, improperly using and exploiting Royce's POC Works, in the State of New York and elsewhere, in connection with the POC Movie Franchise and otherwise.

15.     Upon information and belief, Buena Vista Games, Inc. ("BVGI") is a California corporation that conducts business in the State of New York and who is, and has been, improperly using and exploiting Royce's POC Works, in the State of New York and elsewhere, in connection with the POC Movie Franchise and otherwise.

16.     Upon information and belief, First Mate Productions, Inc. ("FMPI") is a California corporation that conducts business in the State of New York and who is, and has been, improperly using and exploiting Royce's POC Works, in the State of New York and elsewhere, in connection with the POC Movie Franchise and otherwise.

17.     ABC, Inc. ("ABCI") is a New York corporation who is, and has been, improperly using and exploiting Royce's POC Works, in the State of New York and elsewhere, in connection with the POC Movie Franchise and otherwise.

18.     ABC Enterprises, Inc. ("ABCEI") is a New York corporation who is, and has been, improperly using and exploiting Royce's POC Works, in the State of New York and elsewhere, in connection with the POC Movie Franchise and otherwise.

19.     Upon information and belief, Jerry Bruckheimer ("Bruckheimer") is an individual domiciled in the State of California and who is, and has been, improperly using and exploiting Royce's POC Works, in the State of New York and elsewhere, in connection with the POC Movie Franchise and otherwise.

20.     Upon information and belief, Jerry Bruckheimer, Inc. ("JBI") is a California corporation that conducts business in the State of New York and who is, and has been, improperly using and exploiting Royce's POC Works, in the State of New York and elsewhere, in connection with the POC Movie Franchise and otherwise.

21.     Upon information and belief, Jerry Bruckheimer Films ("JBF") is a division in or wholly owned subsidiary of JBI that conducts business in the State of New York and who is, and has been, improperly using and exploiting Royce's POC Works, in the State of New York and elsewhere, in connection with the POC Movie Franchise and otherwise.

22.     "John Does 1-50" are defendants whose identity will be ascertained during discovery to include additional persons and entities responsible for the misconduct set forth herein.

**Jurisdiction And Venue**

23.     This is a civil action seeking damages and injunctive relief for copyright infringement under the Copyright Laws of the United States, 17 U.S.C. 101 *et seq*. This Court has subject matter jurisdiction over the Plaintiff's copyright infringement claims pursuant to 28 U.S.C. 1331 (federal question jurisdiction) and 28 U.S.C. 1338(a) (federal court jurisdiction over copyright claims).  This Court is a proper venue for this copyright infringement case, pursuant to 28 U.S.C. 1400(a), because (a) each Defendant has committed acts of infringement in the State of New York and/or (b) each Defendant resides in New York, does business in New York, or has otherwise engaged in tortious conduct injuring the Plaintiff in New York.

24.     This is also a civil action seeking, *inter alia*, rescission of a release agreement that the Defendants fraudulently procured from the Plaintiff in May-June 2007 in connection with the Defendants' fraudulently procured settlement of a prior copyright infringement lawsuit (the "Fraudulently Procured Release Agreement").  The Fraudulently Procured Release Agreement solely releases the Defendants from copyright infringements taking place *prior* to the May-June 2007 time-period when that instrument was executed. The Fraudulently Procured Release Agreement does *not* bar the Plaintiff from enforcing his copyright infringement rights against the Defendants based upon conduct taking place *after* May-June 2007.

25.     Rescission of the Fraudulently Procured Release Agreement will entitle the Plaintiff to revive and enforce his copyright infringement claims against the Defendants for the time-period since 2003 when the POC Movie Franchise was first launched.

26.     However, even if the Fraudulently Procured Release Agreement is not rescinded,

then the Plaintiff still retains, and the Plaintiff is entitled to enforce, his independently viable copyright infringement claims against the Defendants based upon conduct taking place *after* May-June 2007.

27.     This Court has subject matter jurisdiction over the Plaintiff's state law claim to rescind the Fraudulently Procured Release Agreement, pursuant to 28 U.S.C. 1332, because of the diversity of citizenship of the parties that executed the Fraudulently Procured Release Agreement involving an amount in controversy of at least $75,000. Alternatively, this Court has subject matter jurisdiction over the Plaintiff's state law claim to rescind the Fraudulently Procured Release Agreement pursuant to the Court's supplemental jurisdiction under 28 U.S.C. 1367.

<u>**Copyright Ownership**</u>

28.     Commencing in the 1980's and continuing into the 1990's, the Plaintiff authored and created an array of original supernatural stories and other original works, including but not limited to the following:

(a) Supernatural creature story and derivative movie Dream a Little Evil (1989);

(b) Supernatural romance story Strange Change (1990);

(c) Supernatural ocean story Who Is Jessica Starfish (1991);

(d) Supernatural noir mystery story and derivative game Framed! (1992);

(e) Supernatural romance story Living Doll (1993);

(f) Supernatural adventure story Touchstone (1993);

(g) Supernatural animated ghost story Master Bats (1993);

(h) Supernatural Pirate Story a/k/a SNPM a/k/a POC (1993);

(i)  Supernatural Pirate Movie (1994) -- which is a derivative work of the Supernatural Pirate Story a/k/a SNPM a/k/a POC (1993); and

(j)  Supernatural Pirate Story within Supernatural Interactive Video Computer Game (1994) -- which is a derivative work of the Supernatural Pirate Story a/k/a SNPM a/k/a POC (1993) and the Supernatural Pirate Movie (1994).  Commencing in 1995, this Supernatural Pirate Story within Supernatural Interactive Video Computer Game was commercially manufactured, sold and distributed worldwide.

29.     The Plaintiff authored and created an array of fictional characters, supernatural elements, storylines, plots, themes, sequence structures, screenplay elements and other original works in (a) the Supernatural Pirate Story a/k/a SNPM a/k/a POC (which the Plaintiff started creating in the 1980's and completed in 1993), (b) the Supernatural Pirate Movie (which the Plaintiff created in 1994 as a derivative work of his Supernatural Pirate Story a/k/a SNPM a/k/a POC) and (c) the Supernatural Pirate Story within Supernatural Interactive Video Computer Game (which the Plaintiff created and published in 1994 as a derivative work of his Supernatural Pirate Story a/k/a SNPM a/k/a POC and his Supernatural Pirate Movie).

30.     The Plaintiff's "POC Works" shall be collectively referred to herein as comprising (a) the Plaintiff's Supernatural Pirate Story (including but not limited to the Plaintiff's independent creation of structural blueprints, characters and fictional inventions), (b) the Plaintiff's Supernatural Pirate Movie, (c) the Plaintiff's Supernatural Interactive Video Computer Game and (d) all of the Plaintiff's other original works in connection therewith or related thereto, including but not limited to drawings, artwork, blueprints and screenplay drafts.

31.     As set forth below, the Plaintiff has registered his copyright ownership of his

original POC Works, as follows, with the United States Copyright Office:

(a)     SNPM [Supernatural Pirate Movie] Original Drawing Collection, registered with

the United States Copyright Office at VAu664-116;

(b)     SNPM [Supernatural Pirate Movie] 2nd Level Structural Blueprint, registered with

the United States Copyright Office at PAu2-966-314;

(c)     SNPM [Supernatural Pirate Movie] Storyboards, registered with the United States

Copyright Office at PAu2-966-313;

(d)     SNPM [Supernatural Pirate Movie] Draft #1 [screenplay], registered with the

United States Copyright Office at PAu2-963-147;

(e)     SNPM [Supernatural Pirate Movie] Story Structure [and initial blueprint],

registered with the United States Copyright Office at PAu2-966-310;

(f)     SNPM [Supernatural Pirate Movie] Outline, registered with the United States

Copyright Office at PAu2-966-311;

(g)     SNPM [Supernatural Pirate Movie] Draft #2 [screenplay], registered with the

United States Copyright Office at PAu2-966-316;

(h)     SNPM [Supernatural Pirate Movie] Retooling Draft [screenplay], registered with

the United States Copyright Office at PAu2-966-315;

(i)     Black Pearl Sculpture, registered with the United States Copyright Office at

VAu664-115;

(j)     Black Pearl Ship Art, registered with the United States Copyright Office at

VAu664-114;

(k)      SNPM [Supernatural Pirate Movie] Overlay, registered with the United States

Copyright Office at PAu2-966-312;

(l)      POC [Pirates of the Caribbean] Screenplay, for CD-Rom Interactive Game,

registered with the United States Copyright Office at PA 1-204-748; and

(m)     CD-Rom Interactive Game, registered with the United States Copyright Office at

PA 1-218-108.[1]

32.     Attached hereto as Exhibit A is a non-exhaustive summary of some of the

copyrightable and legally protectable characters, storylines, supernatural aspects, fictional

inventions and other unique elements in Plaintiff's POC Works that have been infringed

by the Defendants in connection with the POC Movie Franchise (and otherwise), without

authorization to do so from the Plaintiff (the "Illustrative Infringing Elements Chart").

33.     The POC Works registered in the United States Copyright Office, together with

the Illustrative Infringing Elements Chart, demonstrate that there is a striking similarity,

much less a substantial similarity, between the Plaintiff's copyrighted creations and the

Defendants' unauthorized use and exploitation thereof in connection with the POC Movie

Franchise (and otherwise).

34.     Commencing in 1995, the Plaintiff's Supernatural Computer Video Interactive

Game was commercially manufactured, sold and distributed worldwide, thereby

providing access to the Defendants to the Plaintiff's copyrightable creations in the POC

Works as incorporated therein.

35.     From 1991 through 1995, the Plaintiff was developing and completing his

copyrighted creations in the POC Works and, during this period, the Plaintiff *directly*

---

[1] Upon information and belief, the Distributor of the Plaintiff's Supernatural Interactive Video Computer
Game may have also registered this work, and the protectable elements therein, for the benefit of the
Plaintiff with the United States Copyright Office.

provided the Disney Defendants with several copies of his developing and subsequently completed POC Works, both through in-person meetings, as well as through the Creative Artists Agency and the William Morris Agency and, pursuant thereto, the Defendants were provided with access to the Plaintiff's copyrightable creations in the POC Works.

36.     The Defendants have publically credited Elliott and Rossio with the purported "creation," during 2002-2003, of the supernatural-based storyline, screenplay, characters and elements for the POC Movie Franchise.  Upon information and belief, Elliott and Rossio worked for the Disney Defendants from approximately 1990-1995 and again since the year 2002.  Paragraphs 34 and 35 allege how Elliott and Rossio were also provided with access to the Plaintiff's copyrightable creations in the POC Works.

37.     Accordingly, pursuant to the Plaintiff's copyright ownership rights to his POC Works, the Plaintiff is entitled, *inter alia*, to the billions of dollars that Disney has generated, or allowed others to generate, from the Defendants' unauthorized use and exploitation of the Plaintiff's POC Works in connection with the POC Movie Franchise (and otherwise).

**The Prior Litigation**

38.     In 2005, the Plaintiff commenced a *pro se* copyright infringement lawsuit against various Disney Defendants (and others) in the United States District Court for the Middle District of Florida.  Thereafter, prior to the joinder of issue in that *pro se* lawsuit, the Plaintiff subsequently retained counsel, pursuant to which the Plaintiff filed a voluntary discontinuance, without prejudice, in that *pro se* lawsuit.

39.     On July 7, 2006, the Plaintiff commenced a copyright infringement lawsuit against various Disney Defendants (and others) in the United States District Court for the

Central District of California (the "Prior Case").  After joinder of issue therein, and *prior* to any court adjudication of the merits of the Plaintiff's claims and the Defendants' affirmative defenses, the Plaintiff, as set forth below, was fraudulently induced by the Defendants to execute the Fraudulently Procured Release Agreement in May-June 2007 in connection with the Defendants' fraudulently procured settlement of the Prior Case.

40.     The Fraudulently Procured Release Agreement in the Prior Case solely releases the Defendants from copyright infringements taking place *prior* to the May-June 2007 time-period when that instrument was executed.

41.     The Fraudulently Procured Release Agreement in the Prior Case does *not* bar the Plaintiff from enforcing his copyright infringement rights against the Defendants based upon conduct taking place *after* May-June 2007.

42.     Rescission of the Fraudulently Procured Release Agreement will entitle the Plaintiff to revive and enforce his copyright infringement claims against the Defendants for the time-period since 2003 when the POC Movie Franchise was first launched.

43.     However, even if the Fraudulently Procured Release Agreement is not rescinded, then the Plaintiff still retains, and the Plaintiff is entitled to enforce, his independently viable copyright infringement claims against the Defendants based upon conduct taking place *after* May-June 2007.

44.     In January 2009, the Plaintiff commenced a *pro se* copyright infringement lawsuit against various Disney Defendants (and others) in the United States District Court for the Middle District of Florida.  The Plaintiff's publically available complaint in that *pro se* lawsuit attaches, as an exhibit, a copy of the entire contents of the Plaintiff's publically available website from www.disneylawsuit.com.

45.     To date, over the course of many years, the Plaintiff has repeatedly notified the Disney Defendants (and others) of the Plaintiff's public filing of his website contents in his January 2009 complaint in his *pro se* lawsuit (as well as in other public postings).  To date, over the course of many years, neither the Disney Defendants (nor other defendants from that *pro se* lawsuit) have provided the Plaintiff with any written objection to the Plaintiff's disclosure of the contents of his publically available website from www.disneylawsuit.com in his publically filed January 2009 complaint in that *pro se* lawsuit (or in the Plaintiff's disclosure of such website contents in other public postings) -- thereby confirming that the publically disclosed contents in Plaintiff's website from www.disneylawsuit.com, and in the Plaintiff's other public postings, are all non-confidential and have become part of the public domain.

46.     In February 2009, the Plaintiff filed papers to discontinue his *pro se* lawsuit, without prejudice, due to threats from and economic duress (and health reasons) caused by the Disney Defendants.

47.     On June 1, 2009, as set forth more fully below, the Plaintiff discovered that the Disney Defendants had previously and fraudulently concealed the existence of crucially important evidence regarding copyright ownership - - thereby revealing that the Disney Defendants, during the Prior Case in California, had intentionally falsified evidence, had engaged in bad faith spoliation, and had fraudulently procured a settlement of that Prior Case through the Fraudulently Procured Release Agreement.

48.     On May 28, 2013, the Plaintiff, represented by counsel, commenced a litigation against the Disney Defendants (and others) in the Orlando Division of the United States District Court for the Middle District of Florida, Case No: 6:13-cv-00821, seeking

various relief, such as rescission of the Fraudulently Procured Release Agreement in order to revive the Plaintiff's previously filed copyright infringement claims against the Disney Defendants (and others) dating back to 2003 when the POC Movie Franchise was first launched (the "Timely-Filed, Fraud-Correcting Case").

49.     The Timely-Filed, Fraud-Correcting Case was filed four (4) days *before* the earliest potential date that the Disney Defendants might have otherwise tried to use as an attempted "bar," under the statute of limitations, to the Plaintiff's fraud-based rescission claim to invalidate the Fraudulently Procured Release Agreement.

50.     When the Timely-Filed, Fraud-Correcting Case was filed on May 28, 2013, the statute of limitations stopped and was frozen on the Plaintiff's fraud-based rescission claim to invalidate the Fraudulently Procured Release Agreement.

51.     On or about May 28, 2013, the Timely-Filed, Fraud-Correcting Case against the Disney Defendants (and others) was assigned to The Honorable G. Kendall Sharp, a Senior Judge in the Orlando Division of the United States District Court for the Middle District of Florida.

52.     On June 4, 2013, the Timely-Filed, Fraud-Correcting Case against the Disney Defendants (and others) was "reassigned" by the Clerk's Office at the Orlando Division of the United States District Court for the Middle District of Florida to The Honorable Roy B. Dalton, Jr., a different Judge in that Orlando Court (the "Unexplained Reassignment").

53.     No substantive reasons have been publically provided by the Clerk's Office for the Unexplained Reassignment of the Timely-Filed, Fraud-Correcting Case, away from

The Honorable G. Kendall Sharp, Senior Judge and, without explanation, to The Honorable Roy B. Dalton, Jr., a different Judge in that Orlando Court.

54.     On June 6, 2013, The Honorable Roy B. Dalton, Jr., now acting as the reassigned Judge, issued a sua sponte Order dismissing the Timely-Filed, Fraud-Correcting Case, _without providing any prior notice to or opportunity to be heard by the Plaintiff and his counsel_, and without any motion papers having been filed by the Disney Defendants (the "Sua Sponte Dismissal Order").

55.     The Plaintiff's complaint and exhibits in the Timely-Filed, Fraud-Correcting Case contain extensive factual allegations, and reference publically available evidence, indicating how the Disney Defendants had fraudulently procured the settlement of the Prior Case through the Fraudulently Procured Release Agreement.  Nevertheless, the Sua Sponte Dismissal Order says that the incorporation by reference of those factual allegations and publically available evidence into the "counts" portion of the complaint seeking fraud-based rescission relief and copyright infringement relief against the Disney Defendants (and others) means that the entire complaint is a "shotgun pleading" that "makes it virtually impossible to know which allegations of fact are intended to support which claims for relief."

56.     Prior to the issuance of the Sua Sponte Dismissal Order, the Plaintiff and his counsel were _not afforded an opportunity_ to explain why the entire complaint was not a "shotgun pleading" and, in any event, why a summary dismissal of a multi-billion case involving publically documented evidence of wrongdoing by the Disney Defendants (and others) would be inappropriate under the law - - particularly where no motion papers had even been filed by the Disney Defendants.

57.     The Sua Sponte Dismissal Order provides that the dismissal of the Timely-Filed, Fraud-Correcting Case is "without prejudice" and states that "On or before June 21, 2013, Plaintiff may file an amended complaint that is consistent with this Order." As a result, the frozen clock on the statute of limitations for a fraud-based rescission claim to invalidate the Fraudulently Procured Release Agreement cannot possibly start to run again before June 22, 2013, at the earliest, subject to the following conditions: (a) the Plaintiff does not file an amended complaint by June 21, 2013 <u>and</u> (b) the Plaintiff does not commence a new, Timely-Filed, Fraud-Correcting Case in another federal court of competent jurisdiction.  Thus, the filing of this Timely-Filed, Fraud-Corrective Case on June 10, 2013 in the United States District Court for the Southern District of New York means that the statute of limitations remains frozen, and has not expired, on the Plaintiff's fraud-based rescission claim to invalidate the Fraudulently Procured Release Agreement.

58.     Since no substantive reasons have been publically provided by the Clerk's Office at the Orlando Court for the reassignment of the Timely-Filed, Fraud-Correcting Case to a different Judge - - and since the reassigned Judge in the Orlando Court did not provide the Plaintiff and his counsel with any prior notice or opportunity to be heard before summarily dismissing a multi-billion case involving publically documented evidence of wrongdoing by the Disney Defendants (and others)  - - the Plaintiff has decided to protect his interests, and to uphold constitutional due process principles, by filing and pursuing a new, Timely-Filed, Fraud-Correcting Case in another federal court, outside of Orlando, where the Disney Defendants do business in New York and are subject to the personal jurisdiction of the New York federal court.

## The Defendants' Duty To Preserve Evidence Since 2003

59.     Prior to mid-July 2003, the Plaintiff had not seen the first POC movie and was unaware of the Defendants' unauthorized use and exploitation of the Plaintiff's POC Works in the POC Movie Franchise (or otherwise).

60.     Shortly after seeing the first POC movie in mid-July 2003, the Plaintiff contacted various potential counsel in California and Florida, in writing and by phone, in July 2003 to ascertain if such potential counsel might be interested in representing the Plaintiff in a copyright infringement lawsuit against the Disney Defendants (and others).

61.     Commencing in August 2003 and thereafter, the Plaintiff provided potential counsel with a collection of evidence he had assembled to prove that the Disney Defendants (and others) were infringing on the Plaintiff's copyright ownership rights to the POC Works.

62.     None of the potential counsel that the Plaintiff contacted during the summer of 2003, and to whom the Plaintiff provided evidence of his copyright ownership, elected to represent the Plaintiff in a copyright infringement lawsuit against the Disney Defendants (and others) and, in fact, some of the potential counsel advised the Plaintiff, but only *after* such counsel had already received the Plaintiff's copyright ownership evidence, that such counsel had a "conflict of interest" that would prevent such counsel from representing the Plaintiff in a copyright infringement lawsuit against the Disney Defendants (and others).

63.     Upon information and belief, during the summer of 2003, the Disney Defendants (and others) were notified about the Plaintiff's copyright claim by one or more potential counsel that the Plaintiff had contacted for the purpose of representing the Plaintiff in a copyright infringement lawsuit against the Disney Defendants (and others) and, if so,

then the Defendants' duty to preserve evidence relating to Plaintiff's copyright infringement claim was triggered during the summer of 2003 and has continued to date.

64.     Upon information and belief, during the summer of 2003, one or more potential counsel that the Plaintiff had contacted, for the purpose of representing the Plaintiff in a copyright infringement lawsuit against the Disney Defendants(and others), provided to the Disney Defendants (or allowed the Disney Defendants to see) the written submissions and copyright ownership evidence that the Plaintiff had provided to such potential counsel and, if so, then the Defendants' duty to preserve evidence relating to the Plaintiff's copyright infringement claim was triggered during the summer of 2003 and has continued to date.

65.     In November 2003, the Hollywood edition of the entertainment publication Variety published an advertisement, placed by the Plaintiff, seeking to retain counsel to represent the Plaintiff in a copyright lawsuit against Disney relating to the POC Movie Franchise.

66.     Upon information and belief, the Disney Defendants (and others) became aware of the Plaintiff's copyright claims by not later than the November 2003 date on which the Plaintiff's attorney advertisement in Variety was published and, if so, then the Defendants' duty to preserve evidence relating to the Plaintiff's copyright infringement claim was triggered at such time and has continued to date.

67.     In or about April 2004, the Plaintiff provided a formal written notice of his copyright claim directly to Disney and, therefore, the Defendants' duty to preserve evidence was triggered by not later than April 2004 (if not sooner during the summer of 2003 or in November 2003) and has continued to date.

**On June 1, 2009, The Plaintiff Discovered That The Disney Defendants Had Previously And Fraudulently Concealed The Existence Of Crucially Important Evidence Regarding Copyright Ownership - -**

**Thereby Revealing That The Disney Defendants, During The Prior California Case, Had Intentionally Falsified Evidence, Had Engaged In Bad Faith Spoliation, And Had Fraudulently Procured A Release Agreement From The Plaintiff In Settlement Of That Prior Case**

68.     In or about March 2005, the Plaintiff retained prior counsel for the purpose of representing his copyright ownership interests against the Disney Defendants (and others) in connection with the negotiation of a potential non-litigated resolution or, alternatively, the pursuit of copyright infringement litigation.

69.     From approximately March 2005 through June 2006 (the "Pre-Litigation Discovery Period"), the Plaintiff and his prior counsel engaged in written (and oral) negotiations with, and provided non-public copyright ownership evidence to, Disney and Disney's counsel, including but not limited to in-person meetings.

70.     During the Pre-Litigation Discovery Period, notwithstanding repeated requests by the Plaintiff and his prior counsel, Disney and Disney's counsel refused to provide any non-public copyright ownership evidence to the Plaintiff and his prior counsel.

71.     On or about July 9, 2003, Disney released the first POC movie in the POC Movie Franchise.

72.     Since Disney, over a lengthy Pre-Litigation Discovery Period, had not produced any non-public copyright ownership evidence to the Plaintiff and his prior counsel, the Plaintiff and his prior counsel had no practical option but to commence a copyright infringement lawsuit against the Disney Defendants (and others), on July 7, 2006, prior to the expiration of a three year period following Disney's release of the first POC movie in

the POC Movie Franchise.  This prior copyright infringement lawsuit shall be defined herein as the "Prior Case."

73.     From approximately July 2006 through April 2007 (the "Prior Case Discovery Period"), the Plaintiff and his prior counsel provided non-public evidence to the Disney Defendants (and the other Defendants therein) in connection with, *inter alia*, depositions, document requests, interrogatories and other litigation-related discovery.

74.     During the Prior Case Discovery Period, the Disney Defendants (and the other Defendants therein) were all represented by the same counsel selected by Disney.

75.     During the Prior Case Discovery Period, the Disney Defendants (and the other Defendants therein) affirmatively represented to the Court and the Plaintiff that Disney had "independently created" all of the copyrightable elements in the POC Movie Franchise, including but not limited to all of the copyrightable elements in the POC Works.

76.     During the Prior Case Discovery Period, the Disney Defendants (and the other Defendants therein) affirmatively represented to the Court and the Plaintiff that Disney had "independently created" the unique supernatural elements in the POC Movie Franchise that involve pirates transforming and turning into living skeletons under the moonlight due to a hideous curse affecting them.

77.     During the Prior Case Discovery Period, the Disney Defendants (and the other Defendants therein) affirmatively represented to the Court and the Plaintiff that (a) the unique supernatural elements in the POC Movie Franchise that involve pirates transforming and turning into living skeletons under the moonlight was based upon "never-before published" theme park artwork from Disney theme park artist Marc Davis

and (b) such artwork, attributed by the Disney Defendants to Marc Davis, is proof that the Disney Defendants had "independently created" a cursed pirate who transforms and turns into a living skeleton and back again in the moonlight *prior* to the time when the Plaintiff created his copyrighted POC Works that feature and express these same supernatural elements.

78.     In or about November 2006, and during the Prior Case Discovery Period, Disney published a book called "Pirates of the Caribbean: From the Magic Kingdom to the Movie" (the "Disney Discovery Book").  On page 56 of the Disney Discovery Book, Disney produced "never-before published" theme park artwork that Disney attributed to Disney theme park artist Marc Davis (the "Purported Davis Artwork").  On page 56 of the Disney Discovery Book, Disney states as follows regarding the Purported Davis Artwork that Disney produces on that page:

> "Although Marc Davis couldn't make as many enhancements as he would have liked, sketches hint at the Pirates of the Caribbean that could have been.  One proposed scene would have bridged the narrative gap between the pirates in their "yo-ho" heyday and the grisly fate awaiting them in the haunted grottoes but alas, Marc's Island of Lost Souls never made it off his drawing board.  "Something I tried to do for Florida was a pirate that would turn into a skeleton," Marc said in the E-Ticket.  "It's a sort of Pepper's Ghost effect. Florida was going to have a kind of island, but this stuff was never done."  The effort was far from wasted, however, and the notion of pirates that transform into skeletons and back again would go on to play a major role when the attraction set sail on the big screen thirty years later."

On page 56 of the Disney Discovery Book, Disney also states as follows regarding the Purported Davis Artwork that Disney produces on that page:

> "BOTTOM: Guests encounter a pirate that transforms into a skeleton and back again in a scene, possibly proposed for the boarding area, which was ultimately cut from the final attraction."

79.     The Purported Davis Artwork that Disney produced on page 56 of the Disney Discovery Book contains an array of details that seek to support the notion that a "pirate" was transforming and turning into a living "skeleton" under the "moonlight."

80.     During the Prior Case Discovery Period, Disney used the Purported Davis Artwork, together with deposition testimony and public statements from Disney writers Elliott and Rossio relating thereto (and public statements from Surrell and Sklar in connection with the Disney Discovery Book), as the primary (if not exclusive) source material to support Disney's factual assertion that Disney had "independently created" the unique supernatural elements in the POC Movie Franchise that involve pirates transforming and turning into living skeletons under the moonlight.

81.     The Plaintiff and his prior counsel actually and justifiably relied upon Disney's representations, during the Prior Case Discovery Period, that the Purported Davis Artwork, together with Elliott and Rossio's deposition testimony and public statements relating thereto (and public statements from Surrell and Sklar in connection with the Disney Discovery Book), was the primary (if not exclusive) source material that supports Disney's factual assertion that Disney had "independently  created" the unique supernatural elements in the POC Movie Franchise that involve pirates transforming and turning into living skeletons under the moonlight.  Indeed, such reliance by the Plaintiff and his prior counsel caused them to execute the Fraudulently Procured Release Agreement in May-June 2007 in connection with Disney's fraudulently procured settlement of the Prior Case.

82.     During the Prior Case Discovery Period, the Disney Defendants (and the other Defendants therein) actually and intentionally knew that Disney's representations were

false and fraudulent in presenting the Purported Davis Artwork, together with Elliott and Rossio's deposition testimony and public statements relating thereto (and public statements from Surrell and Sklar in connection with the Disney Discovery Book), as the primary (if not exclusive) source material to support Disney's factual assertion that Disney had "independently created" the unique supernatural elements in the POC Movie Franchise that involve pirates transforming and turning into living skeletons under the moonlight.

83.     During the Prior Case Discovery Period, and at the time that the Plaintiff and his prior counsel executed the Fraudulently Procured Release Agreement in May-June 2007, neither the Plaintiff nor his prior counsel had been provided with any actual factual proof from Disney that was inconsistent with Disney's representations in presenting the Purported Davis Artwork, together with Elliott and Rossio's deposition testimony and public statements relating thereto (and public statements from Surrell and Sklar in connection with the Disney Discovery Book), as the primary (if not exclusive) source material to support Disney's factual assertion that Disney had "independently created" the unique supernatural elements in the POC Movie Franchise that involve pirates transforming and turning into living skeletons under the moonlight.

84.     In or about May 2009, two years after Disney had used false and fraudulent evidence to procure a settlement of the Prior Case, Disney published a new book called "The Art of Walt Disney World Resort" (the "2009 Disney Art Book").  On page 74 of the 2009 Disney Art Book, Disney produced artwork that Disney attributed to artist Collin Campbell (the "Campbell Artwork").

85.     The Campbell Artwork in the 2009 Disney Art Book contains the same depicted scene that appears in the Purported Davis Artwork in the prior Disney Discovery Book.

86.     The Campbell Artwork in the 2009 Disney Art Book reveals that, in the prior Disney Discovery Book, Disney falsely and fraudulently attributed creation of the Purported Davis Artwork to Marc Davis where, in fact, Collin Campbell is the artist that created such artwork.

87.     The Campbell Artwork in the 2009 Disney Art Book reveals that, in the prior Disney Discovery Book, Disney had altered and tampered with the Campbell Artwork (which Disney falsely presented as having been created by Marc Davis) for the purpose of misrepresenting such artwork as the primary (if not exclusive) source material to support Disney's factual assertion that Disney had "independently created" the unique supernatural elements in the POC Movie Franchise that involve pirates transforming and turning into living skeletons under the moonlight.

88.     A side-by-side, color comparison of the Purported Davis Artwork (which was presented in the November 2006 Disney Discovery Book during the Prior Case) with the Campbell Artwork (which was revealed in the 2009 Disney Art Book) is set forth in the Plaintiff's publically available website at www.disneylawsuit.com, the contents of which are expressly incorporated herein by reference and made a part hereof.

89.     A side-by-side, color comparison of the Purported Davis Artwork (which was presented in the November 2006 Disney Discovery Book during the Prior Case) with the Campbell Artwork (which was revealed in the 2009 Disney Art Book) demonstrates that not only did Disney misrepresent the artwork in the November 2006 Disney Discovery Book as having been created by Marc Davis (where, in fact, such artwork was created by

Colin Campbell), Disney also altered and tampered with the Campbell Artwork.  Indeed, this side-by-side, color comparison reveals that, in the November 2006 Disney Discovery Book, Disney altered and tampered with the Campbell Artwork in various ways identified below, such as by transforming such artwork from a sunlight-based scene involving a generic old man into a false and fraudulent moonlight-based scene involving a purported "pirate":

(a)     Disney darkened the Campbell Artwork to make it appear as if the depicted scene was taking place at nighttime, instead of during daylight, such as by making the sun-lit green moss in the Campbell Artwork almost invisible and by "blackening" the sun-lit rocks and cavern walls in the Campbell Artwork;

(b)     Disney altered the colors in the Campbell Artwork by changing the orange color that represents sunlight with purple hues into the yellow color with blue hues that represents moonlight or nighttime;

(c)     Disney altered the Campbell Artwork to make it appear that moonlight-rays, instead of sunlight-rays, come into the depicted scene;

(d)     Disney cropped and removed the entire right-hand side of the Campbell Artwork in order to eliminate the effects of the sunlight coming in through the top of the Campbell Artwork;

(e)     Disney cropped and removed parts of the left-hand side of the Campbell Artwork to eliminate the effects of the sunlight coming in through the side of the Campbell Artwork;

(f)     Disney presented the artwork as having been created by Marc Davis where, in fact, it was created by Collin Campbell;

25

(g)     Disney adulterated and changed the essence of the Campbell Artwork into something that the Campbell Artwork does not, in fact, depict.  Indeed, the Campbell Artwork (i) does not feature a "pirate," (ii) does not have anything to do with a "pirate" transforming and turning into a living skeleton under the moonlight; (iii) does not have anything to do with a curse; and (iv) does not have anything to do with Disney's Pirates of the Caribbean ride attraction or Disney's factual assertion of "independent creation" of the POC Works; and

(h)     Disney presented the tampered artwork as a proposed, but unused, work for the Pirates of the Caribbean theme park ride attraction where, in fact, it was a work done for, but never used in, the separate Benn Gunn's Cave portion of the separate Treasure Island theme park attraction.  Indeed, on page 74 of the 2009 Disney Art Book, the factual genesis of the Campbell Artwork is presented:

> "ABOVE: Treasure Island/Ben Gunn's Cave
> Collin Campbell, 1972, Acrylic, 26" x 38"
> When Treasure Island opened in 1974, nearly 50,000 cubic yards
> of earth had been added to increase the island's size to eleven acres.
> Treasure Island elements such as the Ben Gunn's Cave and the
> Admiral Benbow Inn were abandoned – its mission had been
> changed to that of a bird sanctuary, though a basic pirate theme
> remained."

90.    On June 1, 2009, the Plaintiff discovered the previously unpublished Campbell Artwork in the 2009 Disney Art Book.

91.    Upon his discovery of the previously unpublished Campbell Artwork in the 2009 Disney Art Book, the Plaintiff immediately notified Disney in writing about his discovery of the same and that Disney had previously and fraudulently concealed this crucially

26

important evidence in the Prior Case, from both the Court and the Plaintiff, regarding copyright ownership.

92.     Subsequent to June 1, 2009, the Plaintiff has again notified Disney as well as Disney's counsel in the Prior Case about his discovery of the previously unpublished Campbell Artwork in the 2009 Disney Art Book and that Disney had previously and fraudulently concealed this crucially important evidence in the Prior Case, from both the Court and the Plaintiff, regarding copyright ownership.

93.      To date, neither Disney nor Disney's counsel in the Prior Case has taken any steps to correct and rectify the fraud that Disney perpetrated on the Court and the Plaintiff in the Prior Case with respect to Disney's previous and fraudulent concealment of this crucially important evidence regarding copyright ownership.

94.     If Disney had produced the Campbell Artwork to the Plaintiff and his prior counsel during the Prior Case Discovery Period, instead of Disney's decision to engage in a fraudulent concealment with respect to Disney's factual assertion of "independent creation," the Plaintiff and his prior counsel never would have executed the Fraudulently Procured Release Agreement in settlement of the Prior Case.

95.     If Disney had produced the Campbell Artwork to the Plaintiff and his prior counsel during the Prior Case Discovery Period, instead of Disney's decision to engage in a fraudulent concealment with respect to Disney's factual assertion of "independent creation," the Plaintiff and his prior counsel would have continued their pursuit of the Plaintiff's copyright infringement claims against the Disney Defendants (and others) in the Prior Case.

96.     Since the Disney Defendants (and other Defendants) have perpetrated a fraud on the Court and the Plaintiff in the Prior Case, the Fraudulently Procured Release Agreement should be rescinded and invalidated, and the Plaintiff should be entitled to revive and pursue his copyright infringement claims against the Disney Defendants (and other Defendants) dating back to 2003 when the POC Movie Franchise was first launched.

## FIRST CLAIM FOR RELIEF
### (Federal Copyright Infringement)
### (June 10, 2010 And Thereafter)

97.     The Plaintiff incorporates by reference all the allegations of paragraphs 1 through 96, inclusive as though set forth in full.

98.     Within three (3) years of the date of filing of this complaint, each one of the Defendants has used and exploited the Plaintiff's POC Works in various ways, within the State of New York and/or in targeting New York residents, including but not limited to (a) the Disney Defendants' release of the fourth POC movie in 2011 and the in-development fifth POC movie scheduled for future release by the Disney Defendants and (b) each Defendant's direct involvement in and infringement of, contribution to, and/or vicarious responsibility for the unauthorized use and exploitation of the Plaintiff's POC Works in movies, television, on-line streaming, DVD's, video games, merchandising and otherwise in connection with, *inter alia*, public showings, distribution, licensing and merchandising of the POC Movies.  The discovery phase of this lawsuit will uncover documents and information, that at present are solely under the Defendants' possession, custody and control, revealing the specific factual basis for establishing the liability of

each Defendant for direct infringement, contributory infringement or vicarious infringement.

99.     Within three (3) years of the date of filing of this complaint, the fourth POC movie alone, which was released in 2011 by the Disney Defendants, has generated more than $1 billion in box office receipts, merchandising receipts and licensing receipts.

100.    The Plaintiff has complied in all respects with 17 U.S.C. 101 *et seq*., including the registration of the Plaintiff's POC Works with the United States Copyright Office.  The Plaintiff has secured the exclusive rights and privileges in and to the copyrights of the POC Works as set forth above.  The Plaintiff has been and still is the sole proprietor of all rights, titles and interests in and to the copyrights in the POC Works.

101.    The Defendants' use and exploitation of the POC Works as set forth above, and the Defendants' allowing others to use and exploit the POC Works as set forth above, without the Plaintiff's consent, violates the exclusive rights belonging to the Plaintiff as the owner of the copyrights in the POC Works, including without limitation the Plaintiff's rights under 17 U.S.C. 106.

102.    The Defendants' infringement is both knowing and intentional.

103.    Infringing activities are carried out by Disney's subsidiaries and are directed and controlled by TWDC.  TWDC directly benefits from the infringing activities of its subsidiaries because monetary profits from those activities are funneled from the subsidiaries to TWDC.  Also, TWDC reflects those profits as its own in publically distributed consolidated financial statements, which impact such things as Disney's stock price and credit rating.

104.    The Plaintiff seeks an award of damages pursuant to 17 U.S.C. 504 and 505.

105.    The Defendants' infringing conduct has also caused and is causing substantial and irreparable injury and damage to the Plaintiff in an amount not capable of determination and, unless restrained, will cause further irreparable injury leaving the Plaintiff without an adequate remedy at law.

106.    The Defendants have willfully engaged in and are willfully engaging in the acts complained of with oppression, fraud and malice and in conscious disregard of the rights of the Plaintiff.  The Plaintiff is, therefore, entitled to the maximum statutory damages allowable.

107.    As a consequence of this dispute between the parties as to the right, title and interest in the POC Works upon which the POC Movie Franchise is based, and pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. 2201 and 2202, the Plaintiff also seeks a resolution of this ongoing controversy by a declaration by this Court as to the rights of the respective parties in this matter.

**SECOND CLAIM FOR RELIEF**
**(Federal Copyright Infringement)**
**(July 1, 2007 To June 9, 2010)**

108.    The Plaintiff incorporates by reference all the allegations of paragraphs 1 through 107, inclusive as though set forth in full.

109.    From July 1, 2007 to June 9, 2010, each one of the Defendants has used and exploited the Plaintiff's POC Works in various ways, within the State of New York and/or in targeting New York residents, including but not limited to (a) the Disney Defendants' release of the third POC movie in 2007 and (b) each Defendant's direct involvement in and infringement of, contribution to, and/or vicarious responsibility for the unauthorized use and exploitation of the Plaintiff's POC Works in movies, television,

on-line streaming, DVD's, video games, merchandising and otherwise in connection

with, *inter alia*, public showings, distribution, licensing and merchandising of the POC

Movies.  The discovery phase of this lawsuit will uncover documents and information,

that at present are solely under the Defendants' possession, custody and control, revealing

the specific factual basis for establishing the liability of each Defendant for direct

infringement, contributory infringement or vicarious infringement.

110.    The third POC movie alone, which was released in 2007 by the Disney

Defendants, has generated more than $1 billion in box office receipts, merchandising

receipts and licensing receipts.

111.    As set forth above, the Defendants perpetrated a fraud on the Court and the

Plaintiff during the Prior Case, as well as prior thereto and subsequent thereto, and this

knowing and intentional fraud, as set forth above, precludes and/or estops the Defendants

from asserting or otherwise relying upon the statute of limitations as a potential

affirmative defense in response to the Plaintiff's damage claims against the Defendants,

during the period from July 1, 2007 to June 9, 2010, for infringement of the Plaintiff's

POC Works.

112.    The Plaintiff has complied in all respects with 17 U.S.C. 101 *et seq.*, including the

registration of the Plaintiff's POC Works with the United States Copyright Office.  The

Plaintiff has secured the exclusive rights and privileges in and to the copyrights of the

POC Works as set forth above.  The Plaintiff has been and still is the sole proprietor of all

rights, titles and interests in and to the copyrights in the POC Works.

113.    The Defendants' use and exploitation of the POC Works as set forth above, and

the Defendants' allowing others to use and exploit the POC Works as set forth above,

without the Plaintiff's consent, violates the exclusive rights belonging to the Plaintiff as the owner of the copyrights in the POC Works, including without limitation the Plaintiff's rights under 17 U.S.C. 106.

114.    The Defendants' infringement is both knowing and intentional.

115.    Infringing activities are carried out by Disney's subsidiaries and are directed and controlled by TWDC.  TWDC directly benefits from the infringing activities of its subsidiaries because monetary profits from those activities are funneled from the subsidiaries to TWDC.  Also, TWDC reflects those profits as its own in publically distributed consolidated financial statements, which impact such things as Disney's stock price and credit rating.

116.    The Plaintiff seeks an award of damages pursuant to 17 U.S.C. 504 and 505.

117.    The Defendants' infringing conduct has also caused and is causing substantial and irreparable injury and damage to the Plaintiff in an amount not capable of determination and, unless restrained, will cause further irreparable injury leaving the Plaintiff without an adequate remedy at law.

118.    The Defendants have willfully engaged in and are willfully engaging in the acts complained of with oppression, fraud and malice and in conscious disregard of the rights of the Plaintiff.  The Plaintiff is, therefore, entitled to the maximum statutory damages allowable.

119.    As a consequence of this dispute between the parties as to the right, title and interest in the POC Works upon which the POC Movie Franchise is based, and pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. 2201 and 2202, the Plaintiff also

seeks a resolution of this ongoing controversy by a declaration by this Court as to the rights of the respective parties in this matter.

**THIRD CLAIM FOR RELIEF**
**(Rescission Of Fraudulently Procured Release Agreement)**
**In Settlement Of The Prior Case)**

120.    The Plaintiff incorporates by reference all the allegations of paragraphs 1 through 119, inclusive as though set forth in full.

121.    As set forth herein, the Defendants perpetrated a fraud on the Court and the Plaintiff during the Prior Case, as well as prior thereto and subsequent thereto.

122.    As set forth herein, the Defendants fraudulently procured the release agreement (to wit: the Fraudulently Procured Release Agreement") signed by the Plaintiff and his counsel in May-June 2007 in settlement of the Prior Case.

123.    The Defendants used fraudulent misrepresentation and fraudulent concealment to induce the Plaintiff and his counsel to agree to each and every provision in the Fraudulently Procured Release Agreement, including but not limited to the fraudulently procured choice-of-forum and choice-of-law clauses, and such choice-of-forum and choice-of-law clauses have no binding effect on the Plaintiff.

124.    Contrary to the language set forth in the Fraudulently Procured Release Agreement, the substantive portions of that instrument were drafted solely by Disney and its counsel.

125.    From approximately July 2006 through April 2007 (the "Prior Case Discovery Period"), the Plaintiff and his prior counsel provided non-public evidence to the Disney Defendants (and the other Defendants therein) in connection with, *inter alia*, depositions, document requests, interrogatories and other litigation-related discovery.

126.    During the Prior Case Discovery Period, the Disney Defendants (and the other Defendants therein) were all represented by the same counsel selected by Disney.

127.    During the Prior Case Discovery Period, the Disney Defendants (and the other Defendants therein) affirmatively represented to the Court and the Plaintiff that Disney had "independently created" all of the copyrightable elements in the POC Movie Franchise, including but not limited to all of the copyrightable elements in the POC Works.

128.    During the Prior Case Discovery Period, the Disney Defendants (and the other Defendants therein) affirmatively represented to the Court and the Plaintiff that Disney had "independently created" the unique supernatural elements in the POC Movie Franchise that involve pirates transforming and turning into living skeletons under the moonlight due to a hideous curse affecting them.

129.    During the Prior Case Discovery Period, the Disney Defendants (and the other Defendants therein) affirmatively represented to the Court and the Plaintiff that (a) the unique supernatural elements in the POC Movie Franchise that involve pirates transforming and turning into living skeletons under the moonlight was based upon "never-before published" theme park artwork from Disney theme park artist Marc Davis and (b) such artwork, attributed by the Disney Defendants to Marc Davis, is proof that the Disney Defendants had "independently created" a cursed pirate who transforms and turns into a living skeleton and back again in the moonlight *prior* to the time when the Plaintiff created his copyrighted POC Works that feature and express these same supernatural elements.

130.    In or about November 2006, and during the Prior Case Discovery Period, Disney

published a book called "Pirates of the Caribbean: From the Magic Kingdom to the

Movie" (the "Disney Discovery Book").  On page 56 of the Disney Discovery Book,

Disney produced "never-before published" theme park artwork that Disney attributed to

Disney theme park artist Marc Davis (the "Purported Davis Artwork").  On page 56 of

the Disney Discovery Book, Disney states as follows regarding the Purported Davis

Artwork that Disney produces on that page:

> "Although Marc Davis couldn't make as many enhancements as he
> would have liked, sketches hint at the Pirates of the Caribbean that
> could have been.  One proposed scene would have bridged the
> narrative gap between the pirates in their "yo-ho" heyday and the
> grisly fate awaiting them in the haunted grottoes but alas, Marc's
> Island of Lost Souls never made it off his drawing board.  "Something
> I tried to do for Florida was a pirate that would turn into a skeleton,"
> Marc said in the E-Ticket.  "It's a sort of Pepper's Ghost effect.
> Florida was going to have a kind of island, but this stuff was never
> done."  The effort was far from wasted, however, and the notion of
> pirates that transform into skeletons and back again would go on to
> play a major role when the attraction set sail on the big screen thirty
> years later."

On page 56 of the Disney Discovery Book, Disney also states as follows regarding the

Purported Davis Artwork that Disney produces on that page:

> "BOTTOM: Guests encounter a pirate that transforms into a
> skeleton and back again in a scene, possibly proposed for the
> boarding area, which was ultimately cut from the final attraction."

131.    The Purported Davis Artwork that Disney produced on page 56 of the Disney

Discovery Book contains an array of details that seek to support the notion that a "pirate"

was transforming and turning into a living "skeleton" under the "moonlight."

132.    During the Prior Case Discovery Period, Disney used the Purported Davis

Artwork, together with deposition testimony and public statements from Disney writers

Elliott and Rossio relating thereto (and public statements from Surrell and Sklar in connection with the Disney Discovery Book), as the primary (if not exclusive) source material to support Disney's factual assertion that Disney had "independently created" the unique supernatural elements in the POC Movie Franchise that involve pirates transforming and turning into living skeletons under the moonlight.

133.    The Plaintiff and his prior counsel actually and justifiably relied upon Disney's representations, during the Prior Case Discovery Period, that the Purported Davis Artwork, together with Elliott and Rossio's deposition testimony and public statements relating thereto (and public statements from Surrell and Sklar in connection with the Disney Discovery Book), was the primary (if not exclusive) source material that supports Disney's factual assertion that Disney had "independently  created" the unique supernatural elements in the POC Movie Franchise that involve pirates transforming and turning into living skeletons under the moonlight.  Indeed, such reliance by the Plaintiff and his prior counsel caused them to execute the Fraudulently Procured Release Agreement in May-June 2007 in connection with Disney's fraudulently procured settlement of the Prior Case.

134.    During the Prior Case Discovery Period, the Disney Defendants (and the other Defendants therein) actually and intentionally knew that Disney's representations were false and fraudulent in presenting the Purported Davis Artwork, together with Elliott and Rossio's deposition testimony and public statements relating thereto (and public statements from Surrell and Sklar in connection with the Disney Discovery Book), as the primary (if not exclusive) source material to support Disney's factual assertion that Disney had "independently created" the unique supernatural elements in the POC Movie

Franchise that involve pirates transforming and turning into living skeletons under the moonlight.

135.     During the Prior Case Discovery Period, and at the time that the Plaintiff and his prior counsel executed the Fraudulently Procured Release Agreement in May-June 2007, neither the Plaintiff nor his prior counsel had been provided with any actual factual proof from Disney that was inconsistent with Disney's representations in presenting the Purported Davis Artwork, together with Elliott and Rossio's deposition testimony and public statements relating thereto (and public statements from Surrell and Sklar in connection with the Disney Discovery Book), as the primary (if not exclusive) source material to support Disney's factual assertion that Disney had "independently created" the unique supernatural elements in the POC Movie Franchise that involve pirates transforming and turning into living skeletons under the moonlight.

136.     In or about May 2009, two years after Disney had used false and fraudulent evidence to procure a settlement of the Prior Case, Disney published a new book called "The Art of Walt Disney World Resort" (the "2009 Disney Art Book").  On page 74 of the 2009 Disney Art Book, Disney produced artwork that Disney attributed to artist Collin Campbell (the "Campbell Artwork").

137.     The Campbell Artwork in the 2009 Disney Art Book contains the same depicted scene that appears in the Purported Davis Artwork in the prior Disney Discovery Book.

138.     The Campbell Artwork in the 2009 Disney Art Book reveals that, in the prior Disney Discovery Book, Disney falsely and fraudulently attributed creation of the Purported Davis Artwork to Marc Davis where, in fact, Collin Campbell is the artist that created such artwork.

139.    The Campbell Artwork in the 2009 Disney Art Book reveals that, in the prior Disney Discovery Book, Disney had altered and tampered with the Campbell Artwork (which Disney falsely presented as having been created by Marc Davis) for the purpose of misrepresenting such artwork as the primary (if not exclusive) source material to support Disney's factual assertion that Disney had "independently created" the unique supernatural elements in the POC Movie Franchise that involve pirates transforming and turning into living skeletons under the moonlight.

140.    A side-by-side, color comparison of the Purported Davis Artwork (which was presented in the November 2006 Disney Discovery Book during the Prior Case) with the Campbell Artwork (which was revealed in the 2009 Disney Art Book) is set forth in the Plaintiff's publically available website at www.disneylawsuit.com, the contents of which are expressly incorporated herein by reference and made a part hereof.

141.    A side-by-side, color comparison of the Purported Davis Artwork (which was presented in the November 2006 Disney Discovery Book during the Prior Case) with the Campbell Artwork (which was revealed in the 2009 Disney Art Book) demonstrates that not only did Disney misrepresent the artwork in the November 2006 Disney Discovery Book as having been created by Marc Davis (where, in fact, such artwork was created by Colin Campbell), Disney also altered and tampered with the Campbell Artwork.  Indeed, this side-by-side, color comparison reveals that, in the November 2006 Disney Discovery Book, Disney altered and tampered with the Campbell Artwork in various ways identified below, such as by transforming such artwork from a sunlight-based scene involving a generic old man into a false and fraudulent moonlight-based scene involving a purported "pirate":

(a)      Disney darkened the Campbell Artwork to make it appear as if the depicted scene was taking place at nighttime, instead of during daylight, such as by making the sun-lit green moss in the Campbell Artwork almost invisible and by "blackening" the sun-lit rocks and cavern walls in the Campbell Artwork;

(b)      Disney altered the colors in the Campbell Artwork by changing the orange color that represents sunlight with purple hues into the yellow color with blue hues that represents moonlight or nighttime;

(c)      Disney altered the Campbell Artwork to make it appear that moonlight-rays, instead of sunlight-rays, come into the depicted scene;

(d)      Disney cropped and removed the entire right-hand side of the Campbell Artwork in order to eliminate the effects of the sunlight coming in through the top of the Campbell Artwork;

(e)      Disney cropped and removed parts of the left-hand side of the Campbell Artwork to eliminate the effects of the sunlight coming in through the side of the Campbell Artwork;

(f)      Disney presented the artwork as having been created by Marc Davis where, in fact, it was created by Collin Campbell;

(g)      Disney adulterated and changed the essence of the Campbell Artwork into something that the Campbell Artwork does not, in fact, depict.  Indeed, the Campbell Artwork (i) does not feature a "pirate," (ii) does not have anything to do with a "pirate" transforming and turning into a living skeleton under the moonlight; (iii) does not have anything to do with a curse; and (iv) does not have anything to do with Disney's Pirates

of the Caribbean ride attraction or Disney's factual assertion of "independent creation" of the POC Works; and

(h)     Disney presented the tampered artwork as a proposed, but unused, work for the Pirates of the Caribbean theme park ride attraction where, in fact, it was a work done for, but never used in, the separate Benn Gunn's Cave portion of the separate Treasure Island theme park attraction.  Indeed, on page 74 of the 2009 Disney Art Book, the factual genesis of the Campbell Artwork is presented:

> "ABOVE: Treasure Island/Ben Gunn's Cave
> Collin Campbell, 1972, Acrylic, 26" x 38"
> When Treasure Island opened in 1974, nearly 50,000 cubic yards
> of earth had been added to increase the island's size to eleven acres.
> Treasure Island elements such as the Ben Gunn's Cave and the
> Admiral Benbow Inn were abandoned – its mission had been
> changed to that of a bird sanctuary, though a basic pirate theme
> remained."

142.     On June 1, 2009, the Plaintiff discovered the previously unpublished Campbell Artwork in the 2009 Disney Art Book.

143.     Upon his discovery of the previously unpublished Campbell Artwork in the 2009 Disney Art Book, the Plaintiff immediately notified Disney in writing about his discovery of the same and that Disney had previously and fraudulently concealed this crucially important evidence in the Prior Case, from both the Court and the Plaintiff, regarding copyright ownership.

144.     Subsequent to June 1, 2009, the Plaintiff has again notified Disney as well as Disney's counsel in the Prior Case about his discovery of the previously unpublished Campbell Artwork in the 2009 Disney Art Book and that Disney had previously and

fraudulently concealed this crucially important evidence in the Prior Case, from both the Court and the Plaintiff, regarding copyright ownership.

145.    To date, neither Disney nor Disney's counsel in the Prior Case has taken any steps to correct and rectify the fraud that Disney perpetrated on the Court and the Plaintiff in the Prior Case with respect to Disney's previous and fraudulent concealment of this crucially important evidence regarding copyright ownership.

146.    If Disney had produced the Campbell Artwork to the Plaintiff and his prior counsel during the Prior Case Discovery Period, instead of Disney's decision to engage in a fraudulent concealment with respect to Disney's factual assertion of "independent creation," the Plaintiff and his prior counsel never would have executed the Fraudulently Procured Release Agreement in settlement of the Prior Case.

147.    If Disney had produced the Campbell Artwork to the Plaintiff and his prior counsel during the Prior Case Discovery Period, instead of Disney's decision to engage in a fraudulent concealment with respect to Disney's factual assertion of "independent creation," the Plaintiff and his prior counsel would have continued their pursuit of the Plaintiff's copyright infringement claims against the Disney Defendants (and others) in the Prior Case.

148.    Since the Disney Defendants (and other Defendants) have perpetrated a fraud on the Court and the Plaintiff in the Prior Case, the Fraudulently Procured Release Agreement should be rescinded and invalidated, and the Plaintiff should be entitled to revive and pursue his copyright infringement claims against the Disney Defendants (and other Defendants) dating back to 2003 when the POC Movie Franchise was first launched.

**FOURTH CLAIM FOR RELIEF**
**(Federal Copyright Infringement)**
**(July 2003 Through June 2007)**

149.    The Plaintiff incorporates by reference all the allegations of paragraphs 1 through 148, inclusive as though set forth in full.

150.    From July 2003 through June 2007, each one of the Defendants has used and exploited the Plaintiff's POC Works in various ways, within the State of New York and/or in targeting New York residents, including but not limited to (a) the Disney Defendants' release of the first POC movie in 2003 and the second POC movie in 2006 and (b) each Defendant's direct involvement in and infringement of, contribution to, and/or vicarious responsibility for the unauthorized use and exploitation of the Plaintiff's POC Works in movies, television, on-line streaming, DVD's, video games, merchandising and otherwise in connection with, *inter alia*, public showings, distribution, licensing and merchandising of the POC Movies.  The discovery phase of this lawsuit will uncover documents and information, that at present are solely under the Defendants' possession, custody and control, revealing the specific factual basis for establishing the liability of each Defendant for direct infringement, contributory infringement or vicarious infringement.

151.    To date, the first POC movie alone, which was released in 2003 by the Disney Defendants, has generated more than $1 billion in box office receipts, merchandising receipts and licensing receipts.

152.    To date, the second POC movie alone, which was released in 2006 by the Disney Defendants, has generated more than $1 billion in box office receipts, merchandising receipts and licensing receipts.

153.     As set forth above, the Defendants perpetrated a fraud on the Court and the Plaintiff during the Prior Case, as well as prior thereto and subsequent thereto, and this knowing and intentional fraud, as set forth above, justifies rescission and invalidation of the Fraudulently Procured Release Agreement and, upon such rescission, the Plaintiff is entitled to revive and pursue his copyright infringement claims against the Defendants for the period from July 2003 through June 2007.

154.     As set forth above, the Defendants perpetrated a fraud on the Court and the Plaintiff during the Prior Case, as well as prior thereto and subsequent thereto, and this knowing and intentional fraud, as set forth above, precludes and/or estops the Defendants from asserting or otherwise relying upon the statute of limitations as a potential affirmative defense in response to the Plaintiff's damage claims against the Defendants, during the period from July 2003 to June 2007, for infringement of the Plaintiff's POC Works.

155.     The Plaintiff has complied in all respects with 17 U.S.C. 101 *et seq*., including the registration of the Plaintiff's POC Works with the United States Copyright Office.  The Plaintiff has secured the exclusive rights and privileges in and to the copyrights of the POC Works as set forth above.  The Plaintiff has been and still is the sole proprietor of all rights, titles and interests in and to the copyrights in the POC Works.

156.     The Defendants' use and exploitation of the POC Works as set forth above, and the Defendants' allowing others to use and exploit the POC Works as set forth above, without the Plaintiff's consent, violates the exclusive rights belonging to the Plaintiff as the owner of the copyrights in the POC Works, including without limitation the Plaintiff's rights under 17 U.S.C. 106.

157.    The Defendants' infringement is both knowing and intentional.

158.    Infringing activities are carried out by Disney's subsidiaries and are directed and controlled by TWDC.  TWDC directly benefits from the infringing activities of its subsidiaries because monetary profits from those activities are funneled from the subsidiaries to TWDC.  Also, TWDC reflects those profits as its own in publically distributed consolidated financial statements, which impact such things as Disney's stock price and credit rating.

159.    The Plaintiff seeks an award of damages pursuant to 17 U.S.C. 504 and 505.

160.    The Defendants' infringing conduct has also caused and is causing substantial and irreparable injury and damage to the Plaintiff in an amount not capable of determination and, unless restrained, will cause further irreparable injury leaving the Plaintiff without an adequate remedy at law.

161.    The Defendants have willfully engaged in and are willfully engaging in the acts complained of with oppression, fraud and malice and in conscious disregard of the rights of the Plaintiff.  The Plaintiff is, therefore, entitled to the maximum statutory damages allowable.

162.    As a consequence of this dispute between the parties as to the right, title and interest in the POC Works upon which the POC Movie Franchise is based, and pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. 2201 and 2202, the Plaintiff also seeks a resolution of this ongoing controversy by a declaration by this Court as to the rights of the respective parties in this matter.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff respectfully prays for judgment against the Defendants as follows:

(a)   Declaring that the Defendants' unauthorized conduct violates the Plaintiff's rights under the Federal Copyright Act;

(b)   Permanently enjoining the Defendants, their officers, directors, agents, service employees, representatives, attorneys, related companies, successors, assigns and all others in active concert or participation with them from copying and republishing any of the POC Works, without the Plaintiff's consent, or otherwise infringing the Plaintiff's copyrights or other rights in the POC Works in any manner;

(c)   Ordering the Defendants to account to the Plaintiff for all gains, profits and advantages derived by the Defendants by their infringement of the Plaintiff's copyrights in the POC Works, or such damages as are proper, and since the Defendants intentionally infringed the Plaintiff's copyrights in the POC Works, for the maximum allowable statutory damages for each violation;

(d)   Awarding the Plaintiff actual and/or statutory damages for the Defendants' copyright infringements in an amount to be determined at trial;

(e)   Awarding the Plaintiff his costs, reasonable attorneys' fees and disbursements in this action pursuant to 17 U.S.C. 505(n);

(f)   Rescinding the Fraudulently Procured Release Agreement;

(g)   Sanctioning the Defendants Pursuant To The Court's Inherent Powers, And Awarding Plaintiff Equitable And Monetary Relief, Due To The Defendants'

Conduct In Fraudulently Procuring The Release Agreement And In

Fraudulently Concealing Their Conduct From The Court In The Prior

Copyright Infringement Case, The Plaintiff, The United States Copyright

Office And The Public; and

(h) Awarding the Plaintiff such other and further relief as is just and proper.

THE PLAINTIFF RESPECTFULLY REQUESTS A TRIAL TO A JURY ON

ALL ISSUES SO TRIABLE.

Dated: June 10, 2013

Law Offices of Michael B. Wolk, P.C.

By: _____
    Michael B. Wolk (MW-2272)
570 Lexington Avenue, 16th Floor
New York, New York 10022
Phone: 212-818-0400
Fax:    646-380-0123
Email: michael.wolk@wolkgroup.com
Attorneys for Plaintiff
 Royce Mathew